Filed 6/22/15  In re Jeremiah L. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| In re JEREMIAH L., a Person Coming Under the Juvenile Court Law. | D067242 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>G.L.,<br><br>        Defendant and Appellant. | (Super. Ct. No. J517704A-B) |


APPEAL from an order of the Superior Court of San Diego County, Carol Isackson, Judge.  Affirmed.


William Hook, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Emily K. Harlan, Deputy County Counsel, for Plaintiff and Respondent.

Dependency Legal Group of San Diego and Tilisha Martin for Minor.

G.L. (Mother) appeals from an order of the juvenile court terminating her parental rights to her children Jeremiah and Jasmine (the children).  Mother's sole contention on appeal is that the juvenile court erred in concluding that she did not establish the applicability of the beneficial relationship exception to termination of parental rights and adoption found in Welfare and Institutions Code section 366.26, subdivision (c)(1)(B)(i).[1]  We conclude the juvenile court did not err, and we accordingly affirm the order terminating Mother's parental rights.

## I

### FACTUAL AND PROCEDURAL BACKGROUND

Jeremiah, who was born in October 2009, has been the subject of two juvenile dependency petitions by the San Diego County Health and Human Services Agency (the Agency) under section 300.

The first petition was filed in January 2010 when Jeremiah was two months old.  As a result of a domestic violence incident between Mother and Jeremiah's father in which Jeremiah was put into physical jeopardy, Jeremiah was removed from Mother's care and placed in licensed foster care.  Mother was successful in making progress on her case plan, and Jeremiah was placed back in Mother's home in April 2011.  The juvenile court terminated jurisdiction over the first juvenile dependency case in October 2011.

---

[1]     Unless otherwise indicated, all further statutory references are to the Welfare and Institutions Code.

2

Meanwhile, Jeremiah's sister, Jasmine, was born in December 2010. During Jeremiah's first juvenile dependency case, the Agency reported that there were no indicators of concern regarding Mother's ability to parent Jasmine.

A second juvenile dependency petition, which concerned both Jeremiah and Jasmine, was filed in December 2012. The petition alleged that while under the influence of methamphetamine, Mother demonstrated psychotic behavior when she jumped off a second floor balcony while holding two-year-old Jasmine, believing that she had to escape from someone who wanted to kill her. Mother was placed on a 14-day psychiatric hold in the hospital due to her continued psychotic behavior, and the children were detained in out-of-home care. Mother was discharged from the psychiatric unit on January 3, 2013.

At a March 2013 hearing, the juvenile court declared the children to be dependents of the court, removed them from Mother's custody and ordered that Mother be provided services by the Agency.[2] The children were placed in a licensed foster home.

At the contested six-month review hearing in November 2013, the juvenile court found that Mother had made some progress with her case plan, but continued the children in the foster home placement where they had resided since March 2013. The Agency's

_____

[2]    The children's presumed father, B.M. (Father), who was also a party to the dependency proceedings, was provided with services and visitation and had his parental rights terminated as well. Father has not filed an appeal from the juvenile court's order terminating his parental rights, and Mother makes no argument challenging the ruling as to Father. We accordingly need not, and do not, discuss Father's role in the dependency proceedings.

report for the hearing stated that Mother had been transported to the emergency psychiatric unit for evaluation six times between March and May 2013; had begun, but not completed, three drug treatment programs; and was currently enrolled in a fourth program, during which she had positive drug and alcohol tests. Mother had also not completed a parenting education program.

The juvenile court held a contested 12-month review hearing over several days in April and May 2014. The Agency's report for the 12-month review hearing stated that Mother had not made substantial progress toward mitigation of the protective risks that brought the children to the attention of the Agency. According to the Agency, Mother did not understand the reason for the removal of the children and continued to lack insight into the protective issues. The Agency accordingly recommended termination of services.

Regarding the type of relationship that Mother had with the children, at the time of the 12-month review hearing, Mother was receiving twice-weekly supervised visitation with the children, during which she showed difficulty managing the children's activities and behavior. Among other things, the social worker stated in a February 2014 report that during visitations, Mother appeared unable to redirect the children and was confrontational and argumentative with staff and the foster parents in front of the children. Mother had shown that she could play with the children, but not that she could keep them safe. When Mother was busy with the one child, the other child turned to the visitation supervisors for comfort.

The Court Appointed Special Advocate for the children reported in February 2014 about visitations she had observed between Mother and the children. As she described in that report, the children were taking longer to warm up to Mother during visits, and Jeremiah would seldom give Mother a hug or allow her to hold his hand while crossing the parking lot. During a visit when Jeremiah was sick, he did not want Mother to hold him.

As the social worker described in an April 9, 2014 addendum report, "at nearly every visit, the mother either loses si[ght] of her children or is unable to redirect and encourages their unruly behavior. She relies on [Agency] supervisors to watch her children. She has permitted her children to hit her, spit at her, step on her foot, and refuse to follow her directions, with little o[r] no consequence." "The mother has also intentionally disengaged from and ignored the children, taking a personal 'time out', when she is stressed or overwhelmed."

The juvenile court found there was not a substantial probability that the children would be returned to Mother's physical custody by the 18-month review hearing, and it therefore terminated reunification services and scheduled a permanency planning hearing.

The permanency planning hearing was held on December 31, 2014. Mother stated she was requesting that the juvenile court select guardianship with continued visitation rather than adoption as a permanent plan because she loved her children and would eventually like to reunify with them. Mother believed she had a bond with the children that would make the beneficial relationship exception to adoption applicable to her case.

5

As stated in the social worker's reports, Mother's visits had not progressed to unsupervised. Although Mother was allowed to telephone the children, she never did so. Mother had been hospitalized in the psychiatric unit from July 18 to July 28, 2014, due to paranoid behavior, and thus missed visits during that time. Upon admission to the hospital, Mother tested positive for methamphetamine and other drugs. Mother again missed visits in September 2014 due to hospitalization and reported also being in the hospital on certain dates in October and November 2014. Mother also missed or cancelled visits on several occasions when she was not hospitalized.

At the permanency planning hearing, the social worker testified that she had observed visits between the children and Mother since early July 2014. The children were excited to see Mother during the visits and responded positively to her. The children have an attachment to Mother, but when the foster parents arrived, the children were ready to go, as their primary relationship is with the foster parents. The social worker testified that stability was important for the children, since both were very young and this was Jeremiah's second dependency. The social worker believed that the children's need for stability outweighed whatever attachment they had to Mother. The same opinion was expressed in the social worker's report, which stated that "[a]lthough the children have enjoyed visits with [Mother], this relationship does not outweigh the stability they would receive in an adoptive home."

The report of the Court Appointed Special Advocate for the children stated that she had observed two visits in August 2014, during which Mother did not engage the children, who played independently of Mother.

6

By the time of the December 31, 2014 permanency planning hearing, the children were four and five years old and had been living in the foster parent's home for 21 months, since March 2013. The foster parents were interested in adopting the children. As the social worker observed, the children were securely attached to the foster parents.

The juvenile court ruled that Mother did not meet her burden to establish the beneficial relationship exception to adoption. The juvenile court observed that Mother had "regular," visits with the children,[3] but the evidence did not indicate a strong parental bond that would be harmed if the relationship was terminated. The juvenile court explained that it appeared Mother and the children loved each other, and the "visits are nice, the children have fun[ and] there is affection shown." Nevertheless because the visits did not progress beyond supervised visitation and Mother's personal issues interfered with her ability to expand the relationship with her children and engage in more frequent unsupervised visits, "it is not a relationship that rises to the level of such weight that the court cannot terminate it because of harm to the children." Further, the juvenile court explained that the children desperately needed stability after their history in the juvenile dependency system, and adoption would provide that stability rather than a permanent plan of guardianship, which Mother was advocating.

The juvenile court found that the children were likely to be adopted and selected a permanent plan of adoption, terminating Mother's parental rights.

_____

[3]    The juvenile court noted, however, that although the visits were regular, they were not "frequent" or "consistent."

## II

## DISCUSSION

*The Juvenile Court Did Not Err in Concluding That Mother Failed to
Establish the Applicability of the Beneficial Relationship Exception to Adoption*

The sole issue presented in Mother's appeal is whether the juvenile court erred in concluding that the beneficial relationship exception to adoption was not established.

A.     *Applicable Law*

At a permanency planning hearing, once the juvenile court finds by clear and convincing evidence that the child is likely to be adopted within a reasonable time, the court is *required* to terminate parental rights and select adoption as the permanent plan, unless the parent shows that termination of parental rights would be detrimental to the child under one of several statutory exceptions. (*In re Michael G.* (2012) 203 Cal.App.4th 580, 589.) One of these statutory exceptions is the beneficial relationship exception to adoption, which applies when it would be detrimental to the child to terminate parental rights in that "[t]he parents have maintained *regular visitation* and contact with the child and *the child would benefit from continuing the relationship*." (§ 366.26, subd. (c)(1)(B)(i), italics added.) The burden is on the party seeking to establish the beneficial relationship exception to produce evidence establishing the exception is applicable. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314 (*Bailey J.*).) Once the juvenile court finds that a parent has met his or her burden to establish the requirements of the beneficial relationship exception are present, the juvenile court may chose a permanent plan other than adoption if it finds the beneficial relationship to be "a

8

compelling reason for determining that termination would be detrimental to the child."

(§ 366.26, subd. (c)(1)(B); see *Bailey J.*, at p. 1314.)

We apply a substantial evidence standard of review to a juvenile court's findings on whether the requirements for the beneficial relationship exception have been established. (*Autumn H.* (1994) 27 Cal.App.4th 567, 576 (*Autumn H.*).)[4]

B.    *The Evidence Supports the Juvenile Court's Determination That Mother Did Not Have a Beneficial Relationship with the Children*

As we have explained, to show the applicability of the beneficial relationship exception to adoption, Mother was required to establish that she had a relationship with the children that they would benefit from continuing. Here, substantial evidence supports the trial court's finding that Mother did not establish the existence of a such a relationship.[5]

---

[4]    As the Agency notes, there is some debate in recent case law on the proper standard of review regarding the beneficial relationship exception. In *In re J.C.* (2014) 226 Cal.App.4th 503, the court applied the substantial evidence standard of review to the factual issues of whether the parent maintained regular visitation and contact with the child and whether the parent proved he or she had a beneficial parental relationship with the child. However, as to the weighing test, in which the juvenile court balances the strength of the parent-child relationship against the benefits the child would derive from adoption to decide whether the relationship is a compelling reason to chose a permanent plan other than adoption, the abuse of discretion test applied to "[t]his ' ". . . quintessentially" discretionary decision.' " (*Id.* at p. 531; see *Bailey J.*, *supra*, 189 Cal.App.4th at pp. 1314-1315.) We need not take a position on that issue, as the juvenile court here did not find a beneficial parental relationship.

[5]    The other requirement for the application of the beneficial relationship exception is regular visitation by the parent. (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 643 ["Overcoming the statutory preference for adoption and avoiding the termination of parental rights requires the parent to show both that he or she has maintained regular visitation with the child and that the child would benefit from continuing the

The statutory phrase "benefit from continuing the relationship" (§ 366.26, subd. (c)(1)(B)(i)) refers to a parent-child relationship that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

To meet the burden of proof to establish a beneficial relationship, "the parent must show more than frequent and loving contact, an emotional bond with the child, or pleasant visits — the parent must show that he or she occupies a parental role in the life

relationship."].) "Regular visitation exists where the parents visit consistently and to the extent permitted by court orders." (*In re I.R.* (2014) 226 Cal.App.4th 201, 212.) Here, although the juvenile court's ruling could have been more precisely expressed, the court appears to have found that Mother engaged in regular visitation with the children by stating that the "court agrees that the parents have had regular visits." We acknowledge, however, as the Agency points out, that there is some uncertainty regarding the juvenile court's findings on regular visitation, as the juvenile court also stated that although Mother's visits were regular they were not "frequent" or "consistent" and didn't "help the relationship to grow."

We need not, and do not, resolve the ambiguity in the juvenile court's finding on regular visitation or determine whether the finding is supported by substantial evidence, as we affirm the trial court's ruling rejecting the applicability of the beneficial relationship exception to adoption on another ground. Specifically, we conclude that Mother did not establish she had the type of parental relationship with the children that satisfied the requirements of the beneficial relationship exception, regardless of whether she engaged in regular visitation.

10

of the child."  (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1527; see *In re Jason J.* (2009) 175 Cal.App.4th 922, 936-937 (*Jason J.*); *In re Derek W.* (1999) 73 Cal.App.4th 823, 827 (*Derek W.*).)  The evidence must establish more than merely "a loving and happy relationship" (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1419), and the parent must be more than " 'a friendly visitor.' "  (*Jason J.*, at p. 938.)  "A child who has been adjudged a dependent of the juvenile court should not be deprived of an adoptive parent when the natural parent has maintained a relationship that may be beneficial to some degree, but that does not meet the child's need for a parent."  (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466.)  "It is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement."  (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.)

Here, although it was undisputed that Mother and the children had a loving relationship, substantial evidence supports the juvenile court's findings that it was not a beneficial parent relationship within the meaning of the statutory exception to adoption. As we have explained, the social worker reported that Mother generally had pleasant and positive visits with the children, but evidence showed that the children did not look to her to meet the type of needs a parent would satisfy.  There was evidence that Mother did not fully engage with the children during visits, had difficulty managing and parenting the children during the visits, and the children did not look to her for support.  The children generally separated easily from Mother, and their primary attachment was with the foster parents, who had cared for them for 21 months at the time of the permanency planning hearing.

11

Based on this evidence, the juvenile court reasonably could conclude that Mother did not establish that she "occupies a parental role in the life of the child" (*In re I.W.*, *supra*, 180 Cal.App.4th at p. 1527), and that Mother's relationship to the children "bears no resemblance to the sort of consistent, daily nurturing that marks a parental relationship." (*Derek W.*, *supra*, 73 Cal.App.4th at p. 827.) The beneficial relationship exception does not apply, as "[t]here is no evidence [the children] ha[ve] any needs only [Mother] can satisfy, or that [they] ha[ve] the type of emotional attachment to [Mother] that would cause [the children] to be greatly harmed if parental rights were terminated." (*Jason J.*, *supra*, 175 Cal.App.4th at p. 938.)

We accordingly conclude that Mother has not successfully shown that substantial evidence does not support the juvenile court's determination that the beneficial relationship to adoption is inapplicable here.

DISPOSITION

The order terminating Mother's parental rights is affirmed.


IRION, J.

WE CONCUR:


NARES, Acting P. J.


HALLER, J.


12